Patrice L. Bishop (182256)
service@ssbla.com
STULL, STULL & BRODY
9430 West Olympic Boulevard
Suite 400
Beverly Hills, CA 90212
Tel:    (310) 209-2468
Fax:    (310) 209-2087

Michael J. Klein
mklein@ssbny.com
Stull, Stull & Brody
6 East 45th Street
New York, NY 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| JAN WILLEM HUBNER and ERIC RIBNER, <br><br> Plaintiffs, <br><br> v. <br><br> ALLAN MAYER, DAVID DANZIGER, ROBERT GREENE, MARVIN IGELMAN, WILLIAM MAUER, AND AMERICAN APPAREL, INC., <br><br> Defendants. | Case No. 15-2965 <br><br> **Complaint for Violation of the Federal Securities Laws and Breach of Fiduciary Duty** |

1.     Plaintiffs, for their Complaint for Violation of the Federal Securities Laws and common law breaches of fiduciary duty, allege upon personal knowledge as to their own acts, and otherwise upon information and belief based on the investigation made by and through their attorneys, which included, *inter alia*, a review of American Apparel, Inc.'s ("American Apparel" or the "Company") April 28, 2014 definitive proxy statement filed with the Securities and Exchange Commission ("SEC") on Form DEF 14-A (the "Proxy Statement"), other SEC filings of American Apparel, news and internet reports, and interviews with witnesses with personal knowledge. Plaintiffs believe that further substantial evidentiary support will exist to the allegations set forth below after opportunity for discovery.

## **NATURE OF THE ACTION**

2.     American Apparel is a Delaware corporation headquartered in Los Angeles. As recognized by Delaware's Court of Chancery, "[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests." *Blasius Industries, Inc. v. Atlas Corp.*, Del. Ch., 564 A.2d 651, 659 (1988). This case is about Directors who abused the underpinning upon which their directorial power rested.

3.     Plaintiffs bring this action as record holders of American Apparel's stock on April 21, 2014, the Proxy Statement's record date (the "Record Date"), who were injured by Defendants' solicitation of proxies via the Proxy Statement. In violation of Section 14(a) ("Section 14(a)") of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n, Rule 14a-9 promulgated thereunder by the SEC, and the Individual Defendants' fiduciary duty of disclosure/candor, the Proxy Statement contained material misrepresentations and/or omissions which caused injury to Plaintiffs and the other record holders as of the Record Date (the "Record Holder(s)").

4.     As the Supreme Court held in finding a private right of action under Section 14(a):

> The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.  The section stemmed from the congressional belief that "fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange."  H. R. Rep. No. 1383, 73d Cong., 2d Sess., 13.  It was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . [had] frustrated the free exercise of the voting rights of stockholders."

*J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964).

5.     American Apparel and the members of its Board of Directors (the "Board"), at all times relevant herein, had a duty to disseminate, in the Company's proxy statements, accurate and truthful information and to correct any previously-issued statements that they learned were materially misleading or untrue, or had become, because of new information, materially misleading or untrue, so that fair corporate suffrage could be achieved.

6.     Via the Proxy Statement, the Defendants solicited Plaintiffs' and the Record Holders' proxies for use at the Company's June 18, 2014 Annual Meeting (the "Annual Meeting") regarding the election of three directors, appointment of independent auditors, and executive compensation.

7.     The misrepresentations and omissions contained in the Proxy Statement violated Section 14(a) and the Individual Defendants' fiduciary duty of disclosure/candor in that the Defendants plainly said one thing (i.e. that Dov Charney ("Charney") continuing to serve as Chairman and Chief Executive Officer

("CEO") following the election of directors was in the best interest of the Company; that Charney was intimately connected to American Apparel's brand identity and was the principal driving force behind American Apparel's core concepts and designs; and that Charney's combined role promoted unified leadership and direction for the Board and executive management and allowed for a single, clear focus for the Company's operational and strategic efforts) but did another (i.e. terminated Charney almost immediately upon the re-election of David Danziger ("Danziger"), Robert Greene ("Greene") and Allan Mayer ("Mayer")) to the Board, thereby depriving Plaintiffs and the Record Holders of: (i) knowledge of the Defendants' real beliefs and intentions regarding Charney and his continued stewardship of the Company; (ii) their right to decide whether to leave the Company in Charney's stewardship; and (iii) the opportunity to propose and/or vote for a competing slate of directors. At no time did any Defendant dissent from or disassociate himself with the Proxy Statement's description of Charney while, as discussed below, planning Charney's ouster from the Company.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9.

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Defendant American Apparel maintains its headquarters and principal place of business within this District.

## **PARTIES**

11.    Plaintiff Jan Willem Hubner was a Record Holder of 39,254 shares of the Company's common stock. Plaintiff Hubner voted his shares in reliance on the misrepresentations in the Proxy Statement.

12.    Plaintiff Eric Ribner was a Record Holder of 3,000 shares of the Company's common stock.  Plaintiff Ribner voted his shares in reliance on the misrepresentations in the Proxy Statement.

13.    Defendant American Apparel is vertically integrated clothing manufacturer, distributor and retailer with its headquarters located at 747 Warehouse Street, Los Angeles, California 90021.  The Company was founded in 1989 by Charney, its former CEO and a former Chairman of the Board.  American Apparel moved its manufacturing and business headquarters to Los Angeles in 1997.  In 2006, *The New York Times* reported that American Apparel's 800,000 square-foot downtown Los Angeles manufacturing factory was the largest single garment factory in the United States.  Under Charney, the Company typically paid its factory workers at a much higher rate than the minimum wage.

14.    Defendant Mayer became a member of the Board on December 12, 2007.  Mayer, along with the other Defendants and non-defendants Charney and Alberto Chehebar ("Chehebar"), solicited Plaintiffs and the Record Holders' proxies via the Proxy Statement.  Among other things, the Proxy Statement requested that shareholders vote in favor of re-electing Mayer to the Board.  Despite the representations made in the Proxy Statement regarding, among other things, Charney's importance to the Company, while actively soliciting proxies Defendant Mayer also assisted in planning the termination of Charney.

15.    Defendant Danziger became member of the Board on June 24, 2011.  Danziger, along with the other Defendants and non-defendants Charney and Chehebar, solicited Plaintiffs and the Record Holders' proxies via the Proxy Statement.  Among other things, the Proxy Statement requested that shareholders

1    vote in favor of re-electing Danziger to the Board.  Despite the representations made
2    in the Proxy Statement regarding, among other things, Charney's importance to the
3    Company, while actively soliciting proxies Defendant Danziger also assisted in
4    planning the termination of Charney.

5    16.    Defendant Greene became member of the Board on December 12,
6    2007.  Greene, along with the other Defendants and non-defendants Charney and
7    Chehebar, solicited Plaintiffs and the Record Holders' proxies via the Proxy
8    Statement.  Among other things, the Proxy Statement requested that shareholders
9    vote in favor of re-electing Greene to the Board.  Despite the representations made
10   in the Proxy Statement regarding, among other things, Charney's importance to the
11   Company, while actively soliciting proxies Defendant Greene also assisted in
12   planning the termination of Charney.

13   17.    Defendant Marvin Igelman ("Igelman") became member of the Board
14   on June 24, 2011.  Igelman, along with the other Defendants and non-defendants
15   Charney and Chehebar, solicited Plaintiffs and the Record Holders' proxies via the
16   Proxy Statement.  Despite the representations made in the Proxy Statement
17   regarding, among other things, Charney's importance to the Company, while
18   actively soliciting proxies Defendant Igelman also assisted in planning the
19   termination of Charney.

20   18.    Defendant William Mauer ("Mauer") became member of the Board on
21   November 28, 2011.  Mauer, along with the other Defendants and non-defendants
22   Charney and Chehebar, solicited Plaintiffs and the Record Holders' proxies via the
23   Proxy Statement.  Despite the representations made in the Proxy Statement
24   regarding, among other things, Charney's importance to the Company, while
25   actively soliciting proxies Defendant Mauer also assisted in planning the termination
26   of Charney.

27   19.    Defendants Mayer, Danziger, Greene, Igelman, and Mauer are
28   collectively referred to herein as the "Individual Defendants."  According to Proxy

5

Statement, it "is being made available to stockholders on or about April 28, 2014 in connection with the solicitation by the Board . . . for proxies for use at the 2014 Annual Meeting of Stockholders."  As members of the Board, each of the Individual Defendants had a duty to disseminate an accurate and truthful Proxy Statement and to update the Proxy Statement as appropriate.  Each of the Individual Defendants also had a duty to formally dissent and disassociate himself from the proxy solicitation if he did not believe the representations made therein were accurate.

20.    Because of the Individual Defendants' positions with American Apparel, they owed a fiduciary duty to Plaintiffs and the Record Holders and had a duty to be forthright in soliciting proxy votes.

21.    The plain text of the Section 14(a) applies to "any person" that "permits[s] the use of his name to solicit any proxy."  Unless a director formally dissents and disassociates himself from the proxy solicitation, that director is considered to be soliciting proxies on behalf of management and is liable for misstatements contained in the proxy materials.

22.    The Proxy Statement stated that it was "being made available to stockholders commencing on or about April 28, 2014 in connection with the solicitation by the Board[.]"

23.    Charney is a non-defendant in this action.  Charney informed Plaintiffs' counsel that he did not know that the Individual Defendants planned to terminate him immediately after the Annual Meeting despite the representations made in the Proxy Statement.  According to the Proxy Statement, during all times relevant herein, non-defendant Charney was the Company's largest shareholder, owning more than 47.2 million shares, or 27%, of the Company's outstanding common stock as of the Record Date.[1]    Among other things, the Proxy Statement stated that

---

[1] As discussed below, Charney's 47.2 million shares represented almost 43% of the Company's shares before his ownership interest was diluted by a secondary offering.

1    Charney "has informed the Company that he intends to vote in favor of the election
2    of Messrs. Danziger, Greene and Mayer to the Board."  Charney informed Plaintiffs'
3    counsel that had he known that the Individual Defendants planned to terminate him
4    immediately after the Annual Meeting, he would have not voted in favor of Messrs.
5    Danziger, Greene and Mayer's re-election, but would have: (i) proposed a different
6    slate of directors and voted in favor of those directors; or (ii) adjourned the meeting,
7    as more fully described below.

8         24.    Chehebar is a non-defendant in this action.  Chehebar became a director
9    of American Apparel on February 17, 2012, and at the time of the issuance of the
10   Proxy Statement served as a member of the Nominating and Corporate Governance
11   Committee of the Board.  Plaintiffs are informed and believe that non-defendant
12   Chehebar did not know that the Individual Defendants planned to terminate Charney
13   immediately after the Annual Meeting despite the representations made in the Proxy
14   Statement.  Charney, who attended the meeting, informed Plaintiffs' counsel that
15   Chehebar did not vote in favor of terminating Charney.

16                          **SUBSTANTIVE ALLEGATIONS**
17   **I.    THE PROXY SOLICITATION**

18        25.    The Proxy Statement, filed with the SEC and disseminated to
19   shareholders on April 28, 2014, by Charney, Chehebar, and the Defendants, advised
20   Plaintiffs and the Record Holders that "[t]he Nominating and Corporate Governance
21   Committee and the Board of Directors each believes that Charney, as the founder of
22   Old American Apparel (as defined under "Corporate Governance and Board
23   Matters" below) and its predecessor companies and as Chairman and Chief
24   Executive Officer of the Company since 2007 and President of the Company from
25   2007 until October 2010, provides our Board with an informed perspective on the
26   Company and the apparel industry and the perspectives and judgment necessary to
27   guide the Company's strategy and monitor its execution."

28

26.    The Proxy Statement also advised shareholders that:

**Board Leadership Structure and Role in Risk Oversight**

Dov Charney, who serves as both our Chief Executive Officer and Chairman of the Board, leads and provides strategic guidance to the Company's management team, each of whom has experience in the apparel industry. American Apparel's senior officers closely supervise all aspects of the Company's business, in particular the design and production of merchandise, the operation of our stores and our financial reporting function. The ***Board of Directors has determined that the combination of these roles held singularly by Mr. Charney is in the best interests of all stockholders given that Mr. Charney founded the Company, is considered intimately connected to American Apparel's brand identity and is the principal driving force behind American Apparel's core concepts and designs.*** The Board believes that it is in the best interests of the Company for the Board to make a determination whether to combine or separate the roles based upon the circumstances. ***The Board has given careful consideration to separating the roles of Chairman of the Board and Chief Executive Officer and has determined that the Company and its stockholders are best served by the current structure. Mr. Charney's combined role promotes unified leadership and direction for the Board and executive management and allows for***

*a single, clear focus for the Company's operational and strategic efforts.*

The combined role of Mr. Charney as both Chairman of the Board and Chief Executive Officer is balanced by the Company's governance structure, policies and controls. Six of the seven members of our Board of Directors qualify as independent directors as defined under the applicable listing standards of the NYSE MKT. The Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee are each composed entirely of independent directors. The Board has designated Allan Mayer as the Company's lead independent director. In his capacity as the lead independent director, Mr. Mayer is responsible for coordinating the activities of our independent directors; convening at meetings of the Board at which the Chairman of the Board is not present, including executive sessions of the independent directors; facilitating communications between Mr. Charney, as the Chairman of the Board and Chief Executive Officer, and other members of the Board; reviewing meeting agendas and schedules, as well as board materials, prior to board meetings; and consulting with the Chairman of the Board to assure that appropriate topics are being discussed with sufficient time allocated for each. ***The Board of Directors currently believes that this structure is in the best interest of the Company as it allows for a balance of power between the Chief Executive Officer and the independent directors and***

*provides an environment in which its independent directors are fully informed, have significant input into the content of Board meeting agendas, and are able to provide objective and thoughtful oversight of management. The Board will continue to consider from time to time whether the Chairman of the Board and Chief Executive Officer positions should remain combined based on what the Board believes is best for the Company and its stockholders.*

(emphasis added).[2]

27.    The Proxy Statement also solicited and recommended shareholders vote, *inter alia*, to approve, on an advisory basis, the compensation of Charney and other named executive officers for the next year, and it informed shareholders that "[t]he Company and Dov Charney are parties to an employment agreement effective as of April 1, 2012, pursuant to which Mr. Charney will serve as the Company's Chief Executive Officer for a term ending on March 31, 2015."

28.    The above material statements necessarily remained "alive" in the minds of investors as a continuing representation because the representations remained available online, as part of the 2014 Annual Meeting materials (as defined in the Proxy Statement), and because the Proxy Statement was a "solicitation [ ] made via the Internet on behalf of the Board of Directors" for which a "phone or Internet vote" received by 7:00 p.m., Eastern Time, on June 17, 2014, would give the named proxies the authority to vote shareholders' shares.

---

[2] The Board's statements were not unique. Jeff Macke of Yahoo! Finance recognized that "without Dov Charney there is no American Apparel, and there certainly are not those [thousands of] manufacturing jobs, and they certainly are not in Southern California where it's very expensive to do business." finance.yahoo.com/news/dov-charney-responds-after-american-apparel-dismissal-191559801.html (video, starting at 1:44).

29.   The proxy statements issued in conjunction with the annual meetings scheduled and held from 2010 through 2014, inclusive, included identical or substantially similar statements regarding Charney, his abilities, and his importance to the Company.

## II.    CONTEMPORANEOUS SEC FILINGS AND PUBLIC REPORTS

30.   While proxies were being solicited, American Apparel's Form 10-Q filed with the SEC on its May 12, 2014 (the "1Q14 10-Q") disclosed that:

> The Company has previously disclosed arbitrations filed by the Company on or about February 17, 2011, related to cases filed in the Supreme Court of New York, County of Kings (Case No. 5018-1) and Superior Court of the State of California for the County of Los Angeles (Case Nos. BC457920 and BC460331) against American Apparel, Dov Charney and certain members of the Board of Directors asserting claims of sexual harassment, assault and battery, impersonation through the internet, defamation and other related claims.  The Company settled one of these cases with no monetary liability to the Company.  In another case, the Company prevailed on its argument that certain claims had been released by the plaintiff, and the remaining claims were recently settled.  In another case, the arbitrator rejected the Company's argument that certain claims had been released, and a hearing will be held in the future on the merits of the parties' claims.  In another case, the arbitrator ruled that both American Apparel and the plaintiff had established certain claims and damages against one another resulting in a net inconsequential amount awarded to the plaintiff,

11

and the arbitrator is considering a request to award attorneys' fees and costs to the plaintiff. The Company is awaiting the arbitrator's ruling on the outstanding attorney's fees and cost issue in this case. In a different case, the arbitrator has held an evidentiary hearing on the parties' respective claims and the Company is waiting for the arbitrator's ruling. The Company cannot provide assurance that, the amount and ultimate liability, if any, with respect to these remaining cases will not materially affect the Company's business, financial position, results of operations, or cash flows.

\* \* \*

We have previously disclosed arbitrations filed by us on or about February 17, 2011, related to cases filed in the Supreme Court of New York, County of Kings (Case No. 5018-1) and Superior Court of the State of California for the County of Los Angeles (Case Nos. BC457920 and BC460331) against us, Dov Charney and certain members of the Board of Directors asserting claims of sexual harassment, assault and battery, impersonation through the internet, defamation and other related claims. We settled one of these cases with no monetary liability to us. In another case, we prevailed on our argument that certain claims had been released by the plaintiff, and the remaining claims were recently settled. In another case, the arbitrator rejected our argument that certain claims had been released, and a hearing will be held in the future on the merits of the parties' claims. In another case, the

arbitrator ruled that both we and the plaintiff had established certain claims and damages against one another resulting in a net inconsequential amount awarded to the plaintiff, and the arbitrator is considering a request to award attorneys' fees and costs to the plaintiff. We are awaiting the arbitrator's ruling on the outstanding attorney's fees and cost issue in this case. In a different case, the arbitrator has held an evidentiary hearing on the parties' respective claims and we are waiting for the arbitrator's ruling. We cannot provide assurance that, the amount and ultimate liability, if any, with respect to these remaining cases will not materially affect our business, financial position, results of operations, or cash flows.

31. The 1Q14 10-Q also reaffirmed that there were no material changes to the risk factors reported in the Company's March 5, 2013 Form 10-K. The 10-K stated, in part:

In particular, we believe we have benefited substantially from the leadership and strategic guidance of Dov Charney. The loss of Dov Charney would be particularly harmful as he is considered intimately connected to our brand identity and is the principal driving force behind our core concepts, designs and growth strategy.

32. American Apparel's Form 10-Q filed with the SEC on its August 18, 2014 (the "2Q14 10-Q") disclosed that the only apparent change to the above-quoted language in Paragraph 29, since the filing of the 1Q14 10-Q, was that: the Company separated itself from Charney; the arbitrator who was considering a request to award attorneys' fees and costs to the plaintiff decided to do so; and the Company was in a

dispute about those fees and costs with its insurer.[3]   Thus there is no reason to believe that anything requiring disclosure to shareholders with respect to Charney's behavior came to the Board's attention between May 12, 2014, and August 18, 2014.

---

[3] A comparison of a paragraph of the 2Q14 10-Q with the paragraph quoted immediately above shows all of the changes made, with stricken through text representing deletions and underlined text representing additions:

> ~~We have~~The Company has previously disclosed arbitrations filed by ~~us~~the Company on or about February 17, 2011, related to cases filed in the Supreme Court of New York, County of Kings (Case No. 5018-1) and Superior Court of the State of California for the County of Los Angeles (Case Nos. BC457920 and BC460331) against ~~us, Dov~~American Apparel, Mr. Charney and certain members of the Board of Directors asserting claims of sexual harassment, assault and battery, impersonation through the internet, defamation and other related claims. ~~We~~The Company settled one of these cases with no monetary liability to ~~us.~~ the Company. In another case, ~~we~~the Company prevailed on ~~our~~its argument that certain claims had been released by the plaintiff, and the remaining claims were recently settled. In another case, the arbitrator rejected ~~our~~the Company's argument that certain claims had been released, and a hearing will be held in the future on the merits of the parties' claims. In another case, the arbitrator ruled that both ~~we~~American Apparel and the plaintiff had established certain claims and damages against one another resulting in a net inconsequential amount awarded to the plaintiff~~,~~ and in June 2014, the arbitrator ~~is considering a request to award attorneys'~~awarded attorneys' fees and costs to the plaintiff. ~~We~~ The Company and its insurance carrier are ~~awaiting~~currently in dispute about insurance coverage of the ~~arbitrator's ruling on the outstanding~~ attorney's fees and ~~cost issue in this case.~~ costs. In a different case, the arbitrator has held an evidentiary hearing on the parties' respective claims and ~~we are~~the Company is waiting for the arbitrator's ruling. ~~We~~ The Company cannot provide assurance that, the amount and ultimate liability, if any, with respect to these remaining cases will not materially

14

33.    Similarly, no arguably relevant media reports are available through Lexis suggesting that any wrongdoing by Charney came to light in the interim period between the Record Date and June 17, 2014, with the possible exception of an article published in *Styleite* on May 9, 2014, which discussed how "[a] supposed American Apparel retail worker wrote an intentionally meandering piece for ADULT magazine that acknowledged rumors suggesting sexual harassment lawsuits filed against American Apparel Chairman and CEO Dov Charney are money-making schemes he himself orchestrates" for Company publicity.  The substance of that article was presumably not the cause for Charney's termination, at least based upon the content of the June 18, 2014 Termination Letter (defined below). Moreover, that article was public before the issuance of the 1Q14 10-Q.

34.    Rather than disclosing any information to shareholders so that shareholders could make an informed decision in their proxy voting, and rather than correct, dissent from, or disassociate from the solicitations of the Proxy Statements, the Defendants continued to solicit votes upon misinformation.

## III.    THE IMMEDIATE, CONFLICTING, FIRING OF DOV CHARNEY

35.    While there do not appear to be public minutes or a transcript of the Annual Meeting or subsequent events available through either the Company's website or some other disclosure, according to reports from *The New York Times*[4] it appears that the Annual Meeting lasted less than an hour and that:

> On Wednesday, just after the company's annual meeting, Mr. Charney sat in a conference room at the Times Square offices of the company's outside counsel,

---

affect ~~our~~the Company's business, financial position, results of operations, or cash flows.

[4] An article entitled "American Apparel Ousts Its Founder Over Posting of Worker's Nude Photos" was published on June 22, 2014 (the "June 22 NYT article").  *See* http://nyti.ms/1pprWs9.

Skadden, Arps, Slate, Meagher & Flom, and was fired by the board. Under the terms of his contract, Mr. Charney will be suspended immediately and formally terminated after 30 days. The directors also voted to remove him as chairman. Mr. Charney still owns 27 percent of the company's stock.

A person with direct knowledge of the meeting said that Mr. Charney was shocked and that the meeting lasted more than nine hours.

36.    Similarly, *The Wall Street Journal*[5] reported that:

It wasn't long after Dov Charney showed up at American Apparel Inc.'s board meeting this week that he learned he was there to be fired.

The controversial CEO and founder of the casual-clothes retailer had weathered years of lawsuits that alleged sexual harassment and abusive behavior in painfully explicit terms. But he reached the end after a group of directors troubled by his responses to some of the suits began to doubt his trustworthiness, a person familiar with the decision said.

The board gathered at noon in a small conference room at the Times Square offices of Skadden, Arps, Slate, Meagher & Flom LLP, the company's legal counsel. Shortly after it ended 10 hours later, directors announced in a news release that they had voted to remove Mr.

---

[5] An article entitled "Inside the American Apparel Revolt" was published on June 20, 2014. *See* http://on.wsj.com/1w64Exu.

Charney as chairman and to fire him as president and CEO for cause, a decision that grew out of "an ongoing investigation into alleged misconduct."

Now, a battle is likely at the top of a company, which made a mark on popular culture with its affordable fashions and sexually themed marketing. Mr. Charney is the largest individual shareholder, with about 27% of American Apparel's stock, according to S&P Capital IQ. He doesn't intend to sell it, said a person familiar with the matter.

37.    A subsequent *New York Post* article of June 28, 2014,[6] reported that:

Last week, five of American Apparel's seven directors voted to suspend Charney as CEO and strip him of his chairman role.

Just minutes earlier, three of the five who voted against Charney had been re-elected to three-year terms at the company's annual shareholder meeting.

38.    Charney informed Plaintiffs' counsel that later during the Board meeting (the "June 18 Board Meeting") held immediately after the Annual Meeting, defendant Mayer presented Charney with two options concerning Charney's continuing role with the Company.  The first option provided that Charney would resign as CEO and Chairman of the Board, and be required to sign over the voting rights of his 47.2 million shares to the Board.  In exchange, Charney would be paid a $4.5 million severance package and repositioned as a paid creative director at a rate of $500 per hour.  The Board would also issue a "positive" press release regarding

---

[6] *See* http://nyp.st/1yXkPNZ.

Charney's resignation.  To accept this option, the Board informed Charney that he would need to do so immediately.

39.    According to Charney, the Termination Letter was the second option presented to him at the June 18 Board Meeting.

40.    Charney's representation of the facts in the two preceding paragraphs is confirmed by the June 22, 2014 NYT article.  Two sources with knowledge told the *The New York Times* that "[t]he board offered Mr. Charney the opportunity to remain at the company as a consultant in a creative role, so long as he resigned as chief executive," and that "a news release had already been written that mentioned an amicable, voluntary parting."  The article further reports that Charney "was told he had to make his decision that day. If he stayed on, he would be paid about $4 million[.] If he refused to step down, he was told he would be fired. Mr. Charney refused."

41.    Charney also informed Plaintiffs' counsel that at the June 18 Board Meeting Defendant Danziger informed him the Board "need[ed] to reposition the company."  According to Charney, defendant Greene told him that "[t]he allegations [in the Termination Letter] are not important.  The point is we want to take a different course."   These statements by defendants Danziger and Greene are irreconcilable with the Proxy Statements' solicitations, including but not limited to that the Board "has determined that the combination of these roles [of CEO and Chairman] held singularly by Mr. Charney is in the best interests of all stockholders given that Mr. Charney founded the Company, is considered intimately connected to American Apparel's brand identity and is the principal driving force behind American Apparel's core concepts and designs."

42.    On June 22, 2014, *BuzzFeed* disclosed the contents of Charney's June 18, 2014 Termination Letter (the "Termination Letter") in full.[7]  The Termination

---

[7]    www.buzzfeed.com/sapna/exclusive-read-ousted-american-apparel-ceo-dov-charneys-term.

Letter claimed, in part, the Charney had "willfully and continuously failed to substantially perform [his] job duties under the Employment Agreement and . . . engaged in willful misconduct that has materially injured the financial condition and business reputation of the Company."  The Termination Letter detailed Charney's allegedly wrongful conduct.  Plaintiffs are informed and believe that of the allegedly wrongful conduct detailed therein was known to the Defendants on the Record Date.

43.     The actions described in Paragraph 68, *infra*, including that the Termination Letter was delivered to Charney within minutes of the Annual Meeting's conclusion, are conclusive evidence that the Individual Defendants, or at least a majority of them, misleadingly solicited proxies.

44.     The same *BuzzFeed* article reported that "[t]he board, for its part, told *BuzzFeed* on Friday that it learned of new information this spring that spurred an investigation, ultimately resulting in its decision to oust Charney."

45.     As to what that "new information" was, and when in the Spring it was learned, the June 22 NYT article reported that:

> The company's board learned early this year that Mr. Charney had known of an employee's plans to publish naked photographs of a former American Apparel worker, Irene Morales, on the Internet. While Mr. Charney did not publish the photographs himself, he did not try to stop them from being published, said the person with knowledge of the investigation, who spoke on condition of anonymity because of the sensitive nature of Mr. Charney's dismissal. Ms. Morales sued Mr. Charney in 2011, claiming he had forced her to perform sexual acts over a period of several months. He claimed that the photos showed that she had pursued him.

1

2

3

In March, after learning that Mr. Charney was aware of plans to publish the photographs, the board decided to conduct an investigation into his behavior.

4

5

6

7

8

9

The investigation, led by the law firm Jones Day, also found that Mr. Charney had used the retailer's resources for his personal use. According to the investigation, he arranged flights for his parents with company money, and he and his friends used company apartments while not on official business.

10  46.  Further as to what that "new information" was, and when in the Spring

11  it was learned, *The New York Post* reported that:[8]

12

13

14

15

"It was the right thing to do": So said Allan Mayer, director and interim co-chairman of American Apparel, about founder Dov Charney's dismissal for cause, citing an "ongoing investigation into alleged misconduct."

16

17

18

19

20

But whatever the details of Charney's latest shenanigans, there can be no doubt that corporate management has long been aware of its top executive's bad behavior. His discharge had little if anything to do with the company's supposed integrity.

21

* * *

22

23

24

25

If doing the "right thing" figured into AA's corporate decision-making, why did the board permit Charney to linger for so long? Or did his dismissal finally come only because the bottom line simply demanded it?

26

27

28

[8] *See* http://nyp.st/V3tDTd.

20

1    "We take no joy in this," Mayer said of Charney's

2    sacking. I beg to differ. After all, the board's move is

3    expected to attract a throng of suitors eager to snatch up

4    the label. And the day after Charney was let go, AA stock

5    prices surged nearly 20 percent in early trading, and kept

6    rising Friday.

7    Whether or not Charney stays on in some consulting

8    capacity after the company is sold, AA will forever be

9    tainted by the man who made it.

10    "People love the brand, and they hate him," one

11    banker report[ed]ly said of Charney's firing. But you can't

12    separate the man from the brand, and the facts demonstrate

13    that company man-agement never really sought to, despite

14    the firm's Wednesday night assertion that AA had grown

15    "larger than any one individual."

16    47.    However, as later reported by *The New York Times* on June 26, 2014:[9]

17    According to a person with knowledge of the

18    board's deliberations, in March, board members received

19    an update on the company's legal proceedings that

20    contained an unusual tidbit: a ruling.

21    An arbitrator had found Mr. Charney guilty of

22    defamation for failing to stop the publication of naked

23    photographs of a former employee, Irene Morales, who

24    had sued him for sexual harassment. But the arbitrator

25    ruled against her on the original harassment claims,

26

27    ────────────────────
[9] *See* http://www.nytimes.com/2014/06/27/business/road-to-dov-charneys-ouster-at-

28    american-apparel.html (the "June 26 NYT Article").

21

1    according to the person familiar with the proceedings. Ms.

2    Morales was eventually awarded about $700,000.

3        With this information in hand, the board called its

4    outside counsel, Jones Day, and taking care not to tip off

5    Mr. Charney or anybody who would feel compelled to

6    inform him, it began to investigate — often by discreetly

7    calling company employees themselves.

8    48.    The Proxy Statement was issued to shareholders and filed with the SEC

9    on April 28, 2015.  The first reason provided in the Termination Letter for Charney's

10   firing was that he breached his fiduciary duty owed to the Company because he was

11   "aware of, but took no steps to prevent an employee under your direct supervision

12   and control from creating and maintaining false, defamatory and impersonating blog

13   posts about former American Apparel employees."  As revealed in the June 26 NYT

14   Article, the Individual Defendants knew about this first allegation at least a month

15   prior to the issuance of the Proxy Statement, supporting Plaintiffs' claim that the

16   Individual Defendants made their false and misleading statements to retain control

17   of the Company.  As the Company disclosed in its June 18, 2014 Form 8-K (the

18   "June 18 Form 8-K"), the firing of Charney implicated its credit agreements.  That

19   8-K stated in part:

20       The Company may be deemed to have triggered an

21       event of default under the Credit Agreement, dated as of

22       May 22, 2013, among the Company and Lion/Hollywood

23       L.L.C. (the "Lion Facility"). Under the terms of the Lion

24       Facility, in the event that Mr. Charney ceases to be the

25       Company's Chief Executive Officer, an event of default

26       occurs and the lenders may declare outstanding obligations

27       to be immediately due and payable. An event of default

28       under the Lion Facility would also trigger an event of

22

default under the Credit Agreement, dated as of April 4, 2013, among the Company and Capital One Business Credit Corp. (the "Capital One Facility"). We are in the process of notifying Lion and Capital One of Mr. Charney's suspension and are seeking a waiver of such event of default. There can be no assurance that that the requested relief will be granted on terms acceptable to us or at all. Unless we are able to secure a waiver, the lenders under the Lion Facility and the Capital One Facility are entitled to, among other things, accelerate the outstanding amounts under the facility. Any such acceleration under our credit facilities would have a material adverse effect on our liquidity, financial condition and results of operations, and could cause us to become bankrupt or insolvent.

49. Exhibit 99.1 to the June 18 Form 8-K stated in relevant part that: American Apparel Board Suspends Dov Charney as CEO and Declares Intent to Terminate Him for Cause; Names John Luttrell as Interim CEO Allan Mayer and David Danziger Elected Co-Chairmen of Board

**LOS ANGELES,** June 18, 2014 -- The Board of Directors of American Apparel, Inc. (NYSE MKT: APP) today voted to replace Dov Charney as Chairman and notified him of its intent to terminate his employment as President and CEO for cause. It is expected that the termination will be effective following a 30-day cure period required under the terms of Mr. Charney's employment agreement.

The Board suspended Mr. Charney from his positions as President and CEO, effective immediately, pending the expiration of the cure period. At the same time, the Board appointed John Luttrell as Interim Chief Executive Officer. Mr. Luttrell, who has been with American Apparel since February 2011 and currently serves as Executive Vice President and Chief Financial Officer, will continue in those positions as well. Prior to joining American Apparel, Mr. Luttrell served as Executive Vice President and Chief Financial Officer of Old Navy, The Wet Seal and Cost Plus.

Also effective immediately, the Board appointed Allan Mayer and David Danziger as Co-Chairmen to replace Mr. Charney as Chairman of the Board. In accordance with the terms of his employment agreement, the Board intends to request Mr. Charney's resignation as a member of the Board concurrently with the effective time of his termination.

Mr. Mayer, who has been a member of the Board since the company went public in 2007 and has served as its lead independent director for the past three years, said the Board's decision to replace Mr. Charney grew out of an ongoing investigation into alleged misconduct.

"We take no joy in this, but the Board felt it was the right thing to do," Mr. Mayer said. "Dov Charney created American Apparel, but the Company has grown much larger than any one individual and we are confident that its greatest days are still ahead."

1
2
3
4
5
6

"The Board is working with a search firm to identify candidates for the job of permanent CEO and, based on our initial discussions with the search firm, we expect the list of possible successors will be impressive," said Mr. Danziger, who has chaired the Board's Audit Committee since 2011.

7
8
9
10
11
12
13
14

"We have one of the best known and most relevant brands in the world, with employees who are second to none; I believe we have a very exciting future," said Mr. Luttrell. "Our core business-designing, manufacturing, and selling American-made branded apparel-is strong and continues to demonstrate great potential for growth, both in the U.S. and abroad. This new chapter in the American Apparel story will be the most exciting one yet."

15
16
17

Mr. Luttrell said American Apparel would remain committed to its sweatshop-free, Made in USA manufacturing philosophy.

18
19
20
21
22
23
24

As a result of the management changes, the Company may have been deemed to have triggered an event of default under its credit agreements and will be in discussions with its lenders for a waiver of the default. Additional details are provided in the Company's Form 8-K filing with the Securities and Exchange Commission, dated June 18, 2014.

25
26
27
28

50.    Reconciling Mayer's statement that, "We take no joy in this, but the Board felt it was the right thing to do" with his and the Board's statement, alive 17 hours beforehand, that in the Proxy Statement that the Board "has determined that the combination [of chairman and CEO being] held singularly by Mr. Charney is in

the best interests of all stockholders given that Mr. Charney founded the Company, is considered intimately connected to American Apparel's brand identity and is the principal driving force behind American Apparel's core concepts and designs" appears impossible.  Charney's alleged misdeeds are beside the point for these proxy fraud claims.  Shareholders should have been given a voice with regards to the Company's direction, and the solicitation materials disseminated by the Defendants were materially misleading.

51. Moreover, the questionable timing of Charney's termination, immediately after the shareholder vote, further suggests that the Defendants knew that if they did not issue the materially false and misleading proxy Charney and other shareholders would propose a competing slate of directors and defeat Danziger, Greene and Mayer, taking control away of the Company from the Individual Defendants.

52. The Proxy Statement stated, in part, that "[y]ou are entitled to notice of and to vote at the Annual Meeting *and any adjournment or postponement thereof only if you were a holder of record of shares of American Apparel, Inc. common stock as of the close of business on April 21, 2014*."  (emphasis added) Additionally, as noted by *In re MONY Group Inc. S'holder Litig.*, 853 A.2d 661 (Del. Ch. 2004), "when shares trade in the market, they generally trade without a proxy, so that the person acquiring the shares does not obtain the right to vote those shares on the merger. Instead, the power to vote remains with the seller who was the record date holder." *Id.* at 669.  Shareholders who held stock as of the Record Date thus maintain the right to vote upon the matters brought up at the Annual Meeting, but with the benefit of accurate information to ensure they are not disenfranchised.

## IV. THE INDIVIDUAL DEFENDANTS PLANNED THEIR SECRET DECISION TO FIRE CHARNEY VERY CAREFULLY

53. While Defendants' reasons for issuing materially false and misleading proxy statements are irrelevant to Plaintiffs' Section 14(a) or breach of fiduciary

duty of disclosure/candor claims, Plaintiffs are informed and believe that the Individual Defendants removed Charney as CEO and Chairman of the Board in order to sell the Company, a decision to which Charney informed Plaintiffs' counsel that he would absolutely not agree. As a result, Defendants first diluted Charney's voting power and then issued the materially false and misleading Proxy.

54.    Charney informed Plaintiffs' counsel that prior to the issuance of the Proxy Statement he had been dissatisfied with Chief Financial Officer ("CFO") Luttrell's performance.    Accordingly, in January 2014 Charney met with the advisory firm Alvarez & Marsal to explore replacing Luttrell as the Company's CFO.

55.    Charney also informed Plaintiffs' counsel that, after his suspension, he learned that on January 14, 2014, CFO Luttrell had a meeting with two investment bankers from Peter J. Solomon during a finance conference in Orlando, Florida at the Ritz Carlton. Marc Cooper, one of the investment bankers for Peter J. Solomon, advised Luttrell and the General Counsel for the Company that "American Apparel could be sold, but not with Dov Charney in the way."

56.    Charney informed Plaintiffs' counsel that he had one discussion about a takeover with Mr. Luttrell. Luttrell called Charney one morning in or around February 2014 and asked if Charney would ever consider taking $100 million for his stake in the company. Charney responded to Luttrell that he had no intention of selling the company.

57.    Charney also informed Plaintiffs' counsel that he learned, after his suspension, that Luttrell:

(a)    Began, in February 2014, to intensify his solicitation of the Board through secret phone calls and meetings;

(b)    Had written a document in February 2014 entitled "Notes to David Danziger" which contained the following plan:    "Remove CEO and

1    replace with an interim replacement.  Put the Company up for sale.

2    Engage Peter Solomon";

3    (c)    Slowly started influencing the Individual Defendants by advancing

4    story that Charney was "incapable of managing a $700 million

5    business," and that the Company's only option was to sell;

6    (d)    Secretly met with Board members, out of town and without Charney's

7    knowledge, to discuss the potential sale of the Company.

8    58.    According to a Form NT-10K filed with the SEC on March 18, 2014,

9  the Company disclosed, *inter alia*, that it was:

10    [A]ctively pursuing several possible financing

11    alternatives as a means to increase the Company's

12    available cash to fund debt service requirements and

13    operational needs. Also, as previously disclosed, the

14    Company is engaged in discussions with Capital One

15    Business Credit Corp. (fka Capital One Leverage Finance

16    Corp.) [(the, "Bondholders")] with respect to a waiver of

17    the Company's noncompliance with, and event of default

18    resulting from such noncompliance with, certain financial

19    maintenance covenants under its credit facility with

20    Capital One Business Credit Corp. (the "Capital One

21    Credit Facility") for the fourth quarter of 2013 and an

22    amendment to the Capital One Credit Facility that would

23    reset such covenants going forward.

24    59.    Confidential Witness 1 ("CW1") is a former board member of the

25  Company, a Record Holder, and a current shareholder.  CW1 has advised Plaintiffs'

26  counsel that a representative of the Bondholders called him prior to the

27  announcement of the equity offering, to inform him that the Company's CFO and

28  the Company's financial advisor were not responding to a proposal made by the

Bondholders that would prevent an impending default arising from the Company's inability to make its scheduled April 15, 2014 interest payment. The representative explained to CW1 that the Bondholders were willing to negotiate and mentioned they would be interested to speak directly to the Company's CEO and largest shareholder, Charney, since the Company's CFO and financial advisor had gone "radio silent."

60.    Soon after this conversation, CW1 called Charney to relay to him that the Bondholders seemed willing to negotiate and urged him to speak with the Bondholders' representative.  Charney said to CW1 that the Company's CFO and financial advisor were handling the situation.

61.    About a week later, on March 26, 2014, the Company announced that it had completed an equity offering of 61 million common shares at $0.50 per share. Following this announcement, the representative of the Bondholders and CW1 spoke again. Both were very surprised that the Company had decided to execute a financing that diluted common shareholders so significantly. The Company's bonds had last traded at a price of $80.00 on March 24, 2014, prior to the announcement of the offering, and last traded at $89.25 on March 26, 2014, the day after the announcement, representing an increase of over 11%.  At the same time, the Company's stock price dropped from $0.75 to $0.51, a decline of over 30%. The representative of the Bondholders expressed amazement that the Company's CFO and financial advisor would pursue such a dilutive equity offering and not negotiate when the Bondholders were willing to enter into a transaction that would have been much less onerous to common shareholders.

62.    CW1 spoke again with Charney, and expressed his disappointment that the Company had decided on the dilutive equity offering instead of negotiating with Bondholders to find a different solution. Charney told CW1 that he was not happy with the equity offering either, and would have preferred a different transaction, but he had been strongly urged by the Company's CFO that the equity offering was the

only feasible alternative given time constraints. Charney also told CW1 that the Board members obtained his approval to move forward with the equity offering by promising to structure an "earnout" arrangement which would allow him to be rewarded with additional shares based upon the attainment of performance goals, which would negate the dilution he suffered by agreeing to move forward with the equity offering.

63.     Charney has confirmed CW1's representations and informed Plaintiffs' counsel that it was Defendant Mayer who convinced him that the Board would grant him an equity earnout package.  Charney informed Plaintiffs' counsel that Defendant Mayer asked experts to help explore ways for Charney to regain his percentage control of the Company.  Charney anticipated the subject of his equity earnout package would be discussed during the June 18 Board Meeting.

64.     Plaintiffs are informed and believe that the Individual Defendants issued the shares in order to substantially dilute Charney's ownership interest in, and therefore control of, the Company.  Pursuant to a July 5, 2013 Schedule 13D/A, prior to the March 2014 secondary offering Charney beneficially owned 47,209,406 shares of Common Stock or 42.8% of American Apparel's outstanding shares.  As noted above, as of the Record Date, as a result of the dilution, Charney only owned 27.2% of the Company's outstanding shares although he still held the same 47,209,406 shares of Common Stock.

65.     Further supporting Plaintiffs' information and belief that the Individual Defendants initiated the secondary offering to dilute Charney's ownership interest in the Company is that the offering was completed at or about the time the Board decided to conduct an investigation into Charney's behavior per the June 22 NYT article quoted herein.

66.     But for the dilution, Charney could have easily removed each of the Individual Defendants with the assistance of the owners of just over 7% of the Company's outstanding stock.  As outlined below, Plaintiffs are informed and

believe that Charney had the support of the Company's third largest shareholder which had a 13% ownership interest.  The Bylaws[10] then stated, in relevant part:

> 3.8 Removal of Directors by Stockholders. The entire Board of Directors or any individual Director may be removed from office with or without cause by a majority vote of the holders of the outstanding shares then entitled to vote at an election of directors. In case the Board of Directors or any one or more Directors be so removed, new Directors may be elected at the same time for the unexpired portion of the full term of the Director or Directors so removed.

67.   Tellingly, immediately after the Annual Meeting at which three of the Individual Defendants were re-elected to the Board, Charney was told he could either resign and turn over voting control of his shares to the Individual Defendants or be terminated.  Charney refused to resign and Luttrell was made interim CEO, as outlined herein.

68.   Between 7 p.m. on June 17th, when the solicitation of proxies ended, and 11 a.m. on June 18th, when the Annual Meeting began, it is evident that the Individual Defendants could not have:  (a) negotiated a deal with an interim CEO; (b) began working and had multiple discussions with a search firm to identify candidates for the job of permanent CEO; (c) been aware of the possible creditor implications of Charney's firing; (d) resolved who would be the new co-chairmen of the board: (e) presented Charney with a draft "positive" press release regarding Charney's resignation and a continued consulting agreement (which release Defendants were prepared to issue and file with the SEC that day); and (f) drafted a detailed five page termination letter.

---

[10] The Company's operative Bylaws filed with the SEC on November 9, 2007, as Exhibit 3.1 (the "Bylaws") to an 8-K.

## V.    SHAREHOLDER SUPPORT FOR CHARNEY

69.    If Defendants had not solicited Plaintiffs and the Record Holders' proxies via the Proxy Statement it is more probable than not that Charney, with the assistance of other shareholders, would have initiated a successful proxy battle for the three Board seats occupied by Danziger, Greene and Mayer.  With his vote, the vote of Chehebar, and the three seats that would have been elected but for the Proxy Statement being misleading, Charney could not have been abruptly terminated. Alternatively, Charney would likely have been reappointed to his CEO position by a new slate of directors if the Individual Defendants had fired Charney prior to the Annual Meeting.

70.    After Charney's termination, *The Wall Street Journal* quoted Minho Roth, the Founding Partner of FiveT Capital, American Apparel's third-largest shareholder as of the Record Date with a stake of approximately 22 million, or 13%, of the Company's outstanding common shares, as stating "I wonder about the timing of this because I think Dov, my impression is, he did a pretty good job turning around the company.  If they wanted to oust him why didn't they do it last year or two years ago?"

71.    Another long term shareholder, Michael Bigger, who owned more than 3.27 million shares of American Apparel during the relevant period, has since tweeted that he remained, as of April 1, 2015, "ready to fund Dov Charney with proper management team to start another [American Apparel]" and that Charney is a "Branding genius [but he] could change [his] opinion if guilty in a court of law."[11]

///

///

///

---

[11] *See* http://stocktwits.com/biggercapital/message/34861080.

32

## VI.   THE LIKELIHOOD OF A PROXY BATTLE AND/OR AN ADJOURNMENT OF THE ANNUAL MEETING WITHOUT THE MATERIALLY FALSE AND MISLEADING STATEMENTS

72.     The statements of Roth and Bigger, along with their ownership interests in the Company, make it more probable than not, that had the Individual Defendants disclosed their plans to terminate Charney after the Annual Meeting, that if. Charney proposed a competing slate of directors, Individual Defendants Danziger, Greene and Mayer would not have been re-elected to the Board and none of the subsequently adopted Board measures discussed below would have been effectuated.

73.     Under the terms of Bylaws, on the issue of voting for members of the Board, "[a]t all meetings of stockholders for the election of directors, a plurality of the votes cast shall be sufficient to elect.  Each stockholder represented at a meeting of stockholders shall be entitled to cast one vote for each share of the capital stock entitled to vote thereat held by such stockholder[.]"  As recognized by the SEC: "[a] 'plurality vote' means that the winning candidate only needs to get more votes than a competing candidate. If a director runs unopposed, he or she only needs one vote to be elected, so an 'against' vote is meaningless."[12]

74.     Under the Bylaws, or alternatively under Delaware law because of material changes affecting the Proxy Statement at a date later than the Bylaws allowed, Charney or any other common shareholder could have properly brought business before the Annual Meeting by providing written notice to the American Apparel's Secretary of the Corporation at its executive offices.

75.     Because the Defendants supported Charney in the Proxy Statement, through the use of the materially false and misleading statements, no other shareholder, including Messrs. Charney, Roth and/or Bigger, proposed a competing slate of directors.   As a result, the Defendants were ensured that Defendants

_____

[12] *See* https://www.sec.gov/spotlight/proxymatters/voting_mechanics.shtml.

Danziger, Greene and Mayer would be re-elected and the Individual Defendants would control the Board and could terminate Charney.

76.    If, on the other hand, the Defendants had not solicited proxies from Plaintiffs and the Record Holders via a proxy statement containing material misrepresentations and/or omissions, it is more probable than not that a competing slate of directors would have been proposed and that competing slate would have received more votes than Defendants Danziger, Greene and Mayer.  According to an 8-K filed with the SEC on June 23, 2014 (the "June 23 10-K), Danziger, Greene and Mayer received more than 62 million, 64 million, and 64 million votes, respectively. As of the Record Date, Charney, Roth and Bigger collectively owned more than 72 million outstanding shares.  Pursuant to the Company's Bylaws, without even the voting support of any other shareholders, Charney, Roth and Bigger, who each supported Charney's role at the Company, could have easily voted in a competing slate of candidates in place of Danziger, Greene and Mayer.

77.    Accordingly, to ensure their control of the Company, the Individual Defendants waited until *after* the materially misleading disclosures had effectively disenfranchised shareholders to terminate Charney.  Any revote should thus not be burdened with any of the subsequently adopted protective measures which, but for the misrepresentations in the Proxy Statement, would never have come into existence.

78.    If Charney had learned of the Board's intent to terminate him, but without sufficient time to propose a competing slate of directors, Charney informed Plaintiffs' counsel that he would have adjourned the meeting.

79.    The Bylaws provide, in relevant part:

Quorum. The holders of a majority of the capital stock issued and outstanding and entitled to vote threat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the

34

1
2
3
4
5
6
7
8
9

transaction of business except as otherwise provided by statute or by the Certificate of Incorporation. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the holders of a majority of the votes entitled to be cast by the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.

10   80.   As noted above, there were 173,497,302 outstanding shares as of the
11   Record Date.  To have a quorum under the Bylaws, 86,748,652 voting shares needed
12   to be present at the Annual Meeting.  The June 23 8-K provides that there were
13   109,342,474 shares voted at the meeting.   That amount included Charney's
14   47,209,406 shares.  If Charney had known of the Individual Defendants' intention to
15   immediately terminate him after the vote, Charney would have adjourned the
16   meeting by removing his shares from the vote, leaving only 62,133,068 voting
17   shares and ensuring that there was a not a quorum present at the meeting.

18   81.   Charney's actions subsequent to the June 18 Board Meeting support
19   Plaintiffs' allegations that without the Defendants' false and misleading statements a
20   proxy battle and/or the adjournment of the Annual Meeting would have occurred.
21   As the Company disclosed in its June 30, 2014 Form 8-K (the "June 30 Form 8-K"):

22
23
24
25
26
27
28

On June 27, 2014, the Company received a request from Mr. Charney purporting to call a special meeting of the Company's stockholders. Mr. Charney states that the purpose of the special meeting will be (i) to amend the Bylaws of the Corporation (the "Bylaws") to fix the number of directors serving on the Board at 15 directors, (ii) to amend the Bylaws to provide that vacancies on the

35

Board created pursuant to actions taken at the special meeting may be filled with individuals identified in a proxy statement filed with the United Stated Securities and Exchange Commission without having to comply with any of the procedural requirements set forth in the Bylaws, (iii) to elect certain individuals to fill vacancies on the Board and (iv) to repeal any amendments to the Bylaws enacted subsequent to October 1, 2010 and prior to the adoption of the foregoing proposals at the special meeting.  The Company believes that Mr. Charney's request is invalid and improper, among other reasons, due to the fact that Mr. Charney previously has been suspended as CEO and relieved of all powers to act on behalf of the Company, and the Committee's belief that the purpose of such request is to further Mr. Charney's own self-interest.  As a result, the Company does not intend to comply with such request to call a special meeting and intends to vigorously contest any action seeking to compel the Company to do so.

## VII.   THE INDIVIDUAL DEFENDANTS TAKE STEPS TO FURTHER ENSURE CHARNEY'S OUTSIDER STATUS

82.   The Board's actions subsequent to the June 18 Board Meeting support Plaintiffs' allegations that the Defendants solicited the Record Holders' proxies with false and misleading information in order to control the Company.

83.   As also disclosed in the June 30 Form 8-K:

On June 28, 2014, the Board approved and adopted Amended and Restated Bylaws of the Company (the "Amended Bylaws"). The Amended Bylaws were effective

36

immediately upon approval by the Board. The following changes are included in the Amended Bylaws:

• The advance notice period for the submission of director nominations and stockholder proposals to be made at an annual meeting of stockholders is amended to 120-150 days before the anniversary date of the annual meeting from 60-90 days prior to the annual meeting. The advance notice period reopens if the annual meeting is called for a date that is more than 25 days before or after the anniversary date of the annual meeting. The Amended Bylaws expand the disclosure requirements and require additional representations for stockholders who propose business or make nominations and require additional disclosures regarding and representations by proposed director nominees.

• Before taking action by written consent, stockholders must provide notice to the Board requesting the establishment of a record date to determine the stockholders entitled to take such action. The Board has 10 days following a stockholder request for a record date to adopt a resolution to set such record date, after which the Board has an additional 10 days to set the record date. The Amended Bylaws include disclosure requirements for stockholders proposing to take action by written consent, including, among other things, disclosing the text of the proposal and the disclosures required for stockholders who submit director nominations and stockholder proposals to be made at an annual meeting of stockholders.

- The Amended Bylaws remove the ability of the Chief Executive Officer, President, Chairman or stockholders to call a special meeting.

- The Amended Bylaws clarified that directors may only be removed "for cause" (which is statutorily required for Delaware companies with a staggered Board of Directors).

- The Amended Bylaws remove the restriction on committees of the Board of Directors from having the power or authority of the Board of Directors with respect to amending the Certificate of Incorporation of the Company.

The foregoing description of the Amended Bylaws is qualified in its entirety by reference to the Amended Bylaws, a copy of which is attached hereto as Exhibit 3.2 and is incorporated herein by reference.

84. The June 30 Form 8-K further disclosed that the Company had adopted a poison pill.

85. As the Company disclosed in its July 9, 2014 Form 8-K:

On July 9, 2014, American Apparel, Inc. (the "Company") entered into a Nomination, Standstill and Support Agreement (the "Support Agreement") with Standard General L.P. ("SG"), Standard General Master Fund L.P., P Standard General Ltd. and Dov Charney (collectively, the "Standard General Group"). The Support Agreement relates to, among other things, the composition of the Company's Board of Directors (the "Board"), the provision by SG of financial support to the Company in an

38

aggregate amount up to $25 million, and the creation of a special committee of the Board to oversee the continuing investigation into alleged misconduct by Dov Charney (the "Investigation").  The Standard General Group also agreed to certain standstill and voting limitations and SG affirmed its commitment to the Company's core values, including the Company's sweatshop-free, "Made in the USA" manufacturing philosophy and maintaining the Company's manufacturing headquarters in Los Angeles, California.

*Board Matters*.  The Support Agreement provides that five of the seven current members of the Board will resign effective ten (10) days following the Company's filing of an Information Statement on Schedule 14f-1 with the Securities and Exchange Commission (the "Information Statement").  Allan Mayer and David Danziger will remain as independent directors and Co-Chairman of the Board.  Immediately after such resignations, Messrs. Mayer and Danziger will appoint the following individuals to fill the vacancies on the Board: one individual designated by SG to the Company to serve as a Class A director of the Company (the "Class A Designee"), two other individuals designated by SG to the Company to serve as Class B directors of the Company (the "Class B Designees" and, together with the Class A Designee, the "Standard General Designees") and two other individuals mutually agreed between SG and the Company to serve as Class C directors of the Company

(the "Joint Designees" and together with the Standard General Designees, the "New Board Designees").

Each of the New Board Designees (other than the Class A Designee) is expected (i) to qualify an independent director under the rules of the NYSE MKT LLC, (ii) not to be affiliated with or have any material relationship with SG and (iii) not to be affiliated with or have any material relationship with Mr. Charney. In addition, Mr. Charney will not serve as a Board member or be nominated by the Company or SG as a Board member.

Pursuant to the Support Agreement, the Company will prepare and file with the Securities and Exchange Commission, and thereafter mail, the Information Statement for the purpose of notifying its stockholders of the above-referenced change in the majority of the Board and other aspects of the Support Agreement.

*Investigation*. The Support Agreement provides that the Company will form a new committee of independent directors (the "Suitability Committee") of the Board for the purpose of overseeing the Investigation. The Suitability Committee will consist of David Danziger, one Standard General Designee and one Joint Designee. Based on the findings of such Investigation, the Suitability Committee will determine if it is appropriate for Mr. Charney to be reinstated as CEO of the Company or serve as any officer or employee of the Company or any of its subsidiaries. Mr. Charney agrees in the Support Agreement not to interfere with or attempt to influence the outcome of

40

the Investigation, or access the Company's computer systems. Until the Suitability Committee makes its final determination, Mr. Charney will be entitled to receive his base salary as a consultant to the Company and will have no supervisory authority over any employees of the Company.

*Standstill*. Among other things, the Standard General Group agreed not to, until the completion of the 2015 Annual Meeting of Stockholders, purchase or acquire any additional beneficial ownership of shares of the Company's common stock (the "Common Stock"), solicit proxies or consents with respect to the Common Stock, form or join any group with respect to the Common Stock, present any proposal at a special meeting of stockholders or through action by written consent, seek the removal of any director or propose any nominee for election to the Board or grant any proxy or consent with respect to other matters. Furthermore, until the completion of the 2015 Annual Meeting of Stockholders, the Standard General Group agreed not to effect or seek to effect any extraordinary corporate transaction, business combination, amendment to the Company's governance documents or certain other activities.

*Core Values*. SG shall publicly affirm its commitment in a press release to the Company's sweatshop-free, "Made in the USA" manufacturing philosophy, maintaining the Company's manufacturing headquarters in Los Angeles, California, and the

Company's tradition of passion, creativity, contrarian thinking, social responsibility, ethical business practices and fair treatment of employees.

Other elements of the Support Agreement include:

• SG agrees to provide additional capital or other financial support to the Company in an aggregate amount up to $25 million (i) to the extent necessary to permit the Company to repay amounts due under the Credit Agreement, dated as of May 22, 2013, by and among the Company, the facility guarantors party thereto, and Lion/Hollywood L.L.C. (as amended) and amounts related thereto (or, if any such amounts previously have been repaid by the Company, replenishment of such amounts used to pay such amounts), and (ii) for any other purposes as the Board, following the director appointments referenced above, may determine are appropriate. Any such capital or financial support shall be provided on market terms reasonably agreed by SG and the Company unless SG accepts other terms. SG and the Company agreed to work together reasonably and in good faith to structure the terms and conditions of the provision of such additional capital or other financial support as soon as practicable, and in such a manner as to comply with applicable NYSE MKT LLC rules and applicable legal requirements;

• The Standard General Group agreed, until the completion of the 2015 Annual Meeting of Stockholders, that to the extent the Common Stock beneficially owned

by the Standard General Group and certain of its affiliates exceeds 33 1/3 percent of the outstanding Common Stock at any Annual or Special Meeting of Stockholders or any adjournments or postponements thereof, the Standard General Group shall cause any excess stock over such amount to be voted for any proposals or other business that comes before any such meeting in proportion to the votes for such proposals or other business cast by the other stockholders of the Company voting at such meeting;

• Mr. Charney irrevocably withdrew his letter dated June 27, 2014, providing notice to the Company of his call of a special meeting of stockholders on September 25, 2014;

• The Board agreed to amend and restate the Company's Bylaws to the form adopted on October 1, 2010, except that the size of the Board shall be fixed at nine directors;

• The Company shall use its reasonable best efforts to cause the election of each New Board Designee as a director of the Company at the 2015 Annual Meeting of Stockholders; and

• The parties agreed to certain mutual releases of claims.

The foregoing description of the Support Agreement does not purport to be complete and is qualified in its entirety by reference to the Support Agreement, which is attached hereto as Exhibit 10.1 and incorporated herein by reference.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The information set forth under Item 3.03 of this
Current Report on Form 8-K is incorporated into this Item
1.01 by reference.

## VIII.  A SHAREHOLDER REACTS TO ONGOING DEVELOPMENTS

86.    A July 17, 2014 press release issued by Bigger Capital announced that
the following letter had been delivered to American Apparel's Board, stating, in
relevant part:

The Bigger Capital Fund, LP, Bachelier, LLC and
the Bigger Family are significant shareholders of
American Apparel, Inc. (NYSE: APP) ("American
Apparel" or the "Company"). We have followed the recent
developments at American Apparel with a growing sense
of puzzlement and concern. We have become confident
that American Apparels' entire Board of Directors (the
"Discredited Board") -- all seven of its current members --
have caused serious damage to the value and reputation of
the Company. American Apparel, a household institution
with strong business fundamentals and great prospects has
been brought to the brink of financial distress and all this,
in our view, because of the reckless actions of the set of
directors who were responsible for overseeing our business
and protecting the value of our investment.

We are extremely gratified to see that five of the
current seven directors will be replaced with new members
of the Board under the recently disclosed arrangement
dated July 9, 2014 with Standard General L.P. and certain
of its affiliates and Dov Charney, now former CEO of
American Apparel (collectively, the "Standard General

44

Group"). However, there can be no justification for the two remaining discredited incumbents, David Danziger and Allan Mayer, to stay on. We firmly believe that Messrs. Danziger and Mayer, who are supposed to remain as directors and Co-Chairmen of the Board, are directly responsible for the value erosion and reputational harm to the Company and as a result have lost the confidence and support of the shareholders and should immediately resign.

The Discredited Board has taken a number of reckless actions that go directly against the best interest of shareholders. Most shockingly, this Board engaged in an apparent coup stealthily and abruptly ousting American Apparel's long-standing CEO and largest shareholder knowing that their actions will cause a near-imminent default under important contractual obligations of the Company and cause it to default on nearly $10 million in loans. Worse, the Discredited Board kept shareholders entirely in the dark about its plans to change the effective control of our company. The Discredited Board calculatedly waited until shareholders (including Mr. Charney with his then approximately 23% [sic] stake) had cast their votes to reelect them at the annual meeting on June 18 and then quickly reconvened just minutes after the closing of the polls and voted to oust Mr. Charney from his position as a CEO (and imminently under the terms of his employment agreement as a director of the Company, a position to which the shareholders of American Apparel had elected him on June 25, 2013). Messrs. Danziger and

Mayer had fiduciary duties to do what is best for us, the
owners of the Company. Messrs. Danziger and Mayer are
bound not only by their responsibilities as our fiduciaries,
but also by the proxy rules to inform shareholders of all
information that shareholders may consider material to
their voting decision prior to casting their vote. It is
mindboggling that Messrs. Danziger and Mayer would not
have thought that shareholders would want to know of
their plans to uproot the senior leadership of our Company
before voting on the election of directors. In our view,
Messrs. Danziger and Mayer have breached their fiduciary
duties to shareholders and withheld material information
that should have been disclosed in the Company's proxy
materials for the annual meeting.

To add injury to insult, on the heels of your
unilateral decision to overhaul the Company's leadership,
this Board made another unilateral decision to adopt a
shareholder-unfriendly rights plan a/k/a poison pill. The
effect of this shareholder rights plan was to stifle
shareholder input by impeding the ability of shareholders
to act together in engaging with the Company's
management and the Discredited Board on critical issues
regarding the leadership of our business.

It is unclear to us how the continuity of Messrs.
Danziger and Mayer on the Board is a positive for
shareholders. For example, during Mr. Danziger's tenure
American Apparel's stock price has fallen from $1.72 in
2011 to today's $1.15. Similarly, during Mr. Mayer's

tenure which started in 2007, American Apparel's shares have lost 92% of their value. With such poor track record it is hard to see why directors Danziger and Mayer should continue to act as stewards of the shareholders' capital. Notably, leading proxy vote advisory firm, Institutional Shareholder Services (ISS) recommended a "withhold" vote last year with respect to the reelection of David Danziger as a result of his service on more than three public boards while serving as a CEO of an outside company. Under ISS corporate governance guidelines there are serious concerns that Mr. Danziger may have too many board engagements to devote the proper amount of attention to American Apparel. We share the concern.

Furthermore, under its agreement with the Standard General Group, the Company has agreed to form a new committee of independent directors of the Board, the Suitability Committee, for the purpose of overseeing the continuing investigation into alleged misconduct by Dov Charney. Mr. Danziger, one of the directors who made the decision to oust Mr. Charney in the first place, will serve as one of the three members of this committee. We believe it is a clear disservice to shareholders and the integrity of the investigative process to place this decision partially in Mr. Danziger's hands once again. It is clear that Mr. Danziger's decision has already been made and he never thought it necessary to see the results of a completed investigation before making it. We firmly believe that any related investigation must be overseen solely by

47

individuals who will have an open-minded, fresh perspective on the matter and will be able to render an impartial decision untainted by their prior involvement in Mr. Charney's ouster.

Directors Danziger and Mayer and their fellow members of the Discredited Board should have informed shareholders of the investigation into Mr. Charney's conduct from its outset. This is critical information that shareholders had the right to know. Instead, the Board completely mismanaged the process by concealing the allegations and investigation from the investment public and then choosing to act unilaterally to oust Mr. Charney with no explanation to shareholders until after the fact, all mid-way through the ongoing investigation.

It is also noteworthy, that this same Board that has felt compelled to oust Mr. Charney even if it means defaulting on close to $10 million in loans, chose to disregard the Company's poor operating and financial results from 2007 through 2012 and reward Mr. Charney by extending the maturity of the Charney Anti-Dilution Provision which entitled him to up to approximately 20,416,000 shares of the Company's common stock as anti-dilution protection (decision we criticized publicly at the time, see our letter to the Board available here, http://biggercapital.squarespace.com/biggercapital-investment/2013/10/10/american-apparel-memorandum.html ).

1
2
3
4
5
6
7
8
9
10
11
12
13

In short, Messrs. Danziger and Mayer have made seemingly arbitrary decisions taking reckless risks with our capital and jeopardizing our business with little regard for shareholder interests or the future of our Company. All seven current directors must be held accountable for this blatant disregard of shareholder rights and value. Accordingly, we demand and expect that directors Danziger and Mayer immediately tender their resignations from the Board and all of its committees.

We look forward to a new chapter for American Apparel under the oversight of a thoroughly new Board uncompromised by the current Board's disastrous decisions of the recent and far past.

14
15

87.   On November 14, 2014, Bigger Capital delivered a second letter to the company's Board, stating, in relevant part, that:

16
17
18
19
20
21
22
23
24
25
26
27
28

The Bigger Capital Fund, LP, Bachelier, LLC and the Bigger Family collectively own more than 2 million shares of American Apparel, Inc. (NYSE: APP) ("American Apparel" or the "Company"), which represents an ownership position significantly larger than the aggregate ownership of all members of the Company's Board of Directors (the "Board"), the CEO and the CFO. We write to you to express our serious and growing concerns with the Company and provide the basis for our conviction that the Board must be immediately reconstituted to replace David [Danziger] and Allan Mayer with direct representatives of American Apparel's minority shareholders.

49

In our letter to you of July 17, 2014, we demanded the immediate resignations of David [Danziger] and Allan Mayer from the Board. We did so because we believe that the lapses in judgment that led to the massive and continuing destruction of shareholder value following the abrupt ouster of the Company's former CEO Dov Charney, have discredited all the members of the prior Board. Accordingly, Messrs. Messrs. [Danziger] and Mayer must be held responsible and should not be allowed to serve as our representatives on the Board.

We renew our call for the resignations of Messrs. [Danziger] and Mayer for a number of reasons. In the first instance, although we continue to be supportive of the replacement of five directors with three designees of Standard General L.P. and its affiliates ("Standard General") and two designees mutually agreed upon by Standard General and the Company, we are becoming increasingly concerned that the new Board, led by Co-Chairmen [Danziger] and Mayer, is not as committed to protect the interests of all shareholders as we had hoped. For example, this Board never bothered to respond to our July 17th letter or address our concerns in any form. At a time when the Company is suffering ever widening losses, is embroiled in a much publicized investigation of its former CEO, is still absorbing changes in its senior executive team, and the stock is taking a beating, the Board has a heightened responsibility to soothe shareholder concerns and assure us that all is being done to

protect our investment. Such disregard of minority shareholders especially at this critical time is inexcusable.

We were concerned by Co-Chairman Mayer's statement in a CNBC interview that "The irony is the ally[Standard General] he[Charney] found...turned out to be our[Mayer and [Danziger]] ally." We remind our representatives on the Board that their fiduciary duties are to serve the best interests of all shareholders. In our view, this means addressing the concerns of shareholders like us. It also means that the Board ought to provide full and fair disclosure of all material events to all shareholders. There are a lot of questions about the state and the future of the Company and this Board has not done a good job of providing answers.

As things currently stand, American Apparel is continuing to sustain massive losses and erosion of shareholder value persists. The Company has massively underperformed peers on a profitability basis for years. For example, while American Apparel's Adjusted EBITDA margin is at 6%, its most comparable companies have significantly higher EBITDA margins on a trailing basis as follows:

* * *

We believe American Apparel stock is deeply undervalued because the Company has a terrific franchise capable of generating superior EBITDA margins. Our analysis of the underlying value of American Apparel leads us to conclude that, absent all the uncertainty and

51

extraneous factors that have impacted the stock negatively, the Company's shares could be worth more than $2 per share. The Company's Board and management need to take a sober look at the valuation gap and the causes for value erosion and provide an honest account to themselves and to all the Company's shareholders of the actions within their control that can unlock value. The market's negative reaction to the latest earnings release is an indication that the market has no faith that the Board as led by Co-Chairmen [Danziger] and Mayer would unlock this value.

Perhaps most outrageously the Company spent $5.3 million in legal fees in connection with the ongoing investigation into alleged misconduct by Dov Charney (the "Charney Investigation"). It is of great concern that the Board and its Sustainability Committee have failed to complete the Charney Investigation to date. The Suitability Committee was supposed to use its reasonable best efforts to conclude the investigation no later than 30 days from July 9, 2014 (subject to extensions that the Suitability Committee determines in good faith are reasonably required). Four months later no conclusion has been communicated and shareholders remain entirely in the dark regarding the status of the investigation. The uncertainty surrounding the investigation, the role, if any, of Dov Charney with the Company going forward, as well as the composition of the leadership team, generally, have deeply depressed the price of the Company's stock. Every day

that this Board roils in indecision and fails to provide firm answers is a day that shareholders lose money C both in the markets and as a result of the exorbitant costs associated with the investigative process. This situation is unsustainable and unacceptable.

The continued Charney Investigation is not only unduly expensive but is also, in our view, clearly compromised. We had previously expressed our outrage that Co-Chairman [Danziger], who directly participated in the controversial ouster of Dov Charney was named as one of the three members of the Sustainability Committee conducting the Charney Investigation. In short, there is undisputed evidence that [Danziger]'s judgment regarding this matter has been compromised and that he should not in any way be involved in what is intended to be an unbiased and fair investigation. Further, Co-Chairman Mayer has gone on record publicly stating that he will resign if Mr. Charney is proven not guilty in the investigation. American Apparel's shareholders deserve fair and quick answers to end the uncertainty and stop the value destruction.

It is apparent to us that addressing the issues facing American Apparel requires that the following actions be immediately taken by the Board:

1. The two directors remaining from the prior discredited Board, Messrs. [Danziger] and Mayer must immediately tender their resignations. Messrs. [Danziger] and Mayer, together with their fellow directors at the time,

directly caused enormous economic and reputational harm to the Company and must take responsibility.

2.    The    Board    must    promptly    invite    direct representatives of the Company's minority shareholders to join the Board and fill the resulting vacancies from Messrs. [Danziger] and Mayer's resignations.

3. The Sustainability Committee must act with the utmost    sense    of    urgency    to    complete    the    Charney Investigation without further delay.

In summary, we want to stress our conviction that at this critical time for the Company, it is imperative that the Board must conduct itself in accordance with the highest governance standards, representing fairly and vigorously the interests of all shareholders, providing transparency and full disclosure of all material events and addressing the concerns of all its shareholders. Our expectation is that the Board    will    immediately    engage    with    us    to    work constructively towards a solution along the lines laid out in this letter. Should the Board disregard us again, we stand fully prepared to pursue all available courses of action that we believe necessary to protect shareholder rights and value, including seeking the election of director candidates on the Board of American Apparel. We look forward to a productive dialogue with the Board.

///

///

///

## IX. ONGOING ACTIONS RELATING TO THE PROXY STATEMENT AND FIRING OF CHARNEY

88.    As the Company disclosed in its December 19, 2014 Form 8-K:

On December 15, 2014, the Board of Directors of American Apparel, Inc. (the "Company") appointed Paula Schneider as Chief Executive Officer of the Company, effective as of January 5, 2015.   Scott Brubaker will continue to serve as Interim Chief Executive Officer until Ms. Schneider's employment commences, after which he will remain as a consultant to ensure an orderly transition.

On December 15, 2014, the Board of Directors also voted to terminate Dov Charney, former President and Chief Executive Officer, for cause in accordance with the terms of his employment agreement.   Such decision followed a determination by a special committee of the Board of Directors that it was not appropriate for Dov Charney to be reinstated as Chief Executive Officer or serve as an officer or employee of the Company.   Mr. Charney's consulting relationship with the Company, which began at the time of his suspension as Chief Executive Officer, was also terminated on such date.

89.    As the Company disclosed in its March 25, 2015 Form 10-K:

[O]n or about June 23, 2014, Mr. Charney submitted a demand in arbitration against us in connection with his suspension, which had been stayed pending the determination of the Suitability Committee in the Internal Investigation. As a result of Mr. Charney's termination for cause, such stay is no longer in effect and we recently have

received correspondence indicating that he intends to reinstate his demand for arbitration. Additionally, Mr. Charney may seek to file additional lawsuits against us arising from his termination for cause.

* * *

SEC Investigation

On February 5, 2015, the Company learned that the Securities and Exchange Commission had issued a formal order of investigation with respect to matters arising from the Suitability Committee's review relating to Mr. Charney. The SEC's investigation is a non-public, fact-finding inquiry to determine whether any violations of law have occurred. The Company intends to cooperate fully with the SEC in its investigation.

**NO SAFE HARBOR**

90. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein as being materially false and misleading were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Moreover, the above material statements remained "alive" as a continuing representation seeking proxies for the Annual Meeting at a time when it is certain the Individual Defendants had views that were irreconcilable with the statements made.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT I**

**AGAINST ALL DEFENDANTS FOR VIOLATIONS OF**

**SECTION 14(a) AND RULE 14a-9 THEREUNDER**

91.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs, as if fully set forth herein.  This Count is brought pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9.

92.    The Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from the Record Holders by means of a Proxy Statement that contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

93.    As a result, Plaintiffs, as Record Holders, were denied the opportunity to make an informed decision in voting on American Apparel's corporate governance and were denied fair corporate suffrage as they otherwise would have had, and otherwise might have elected different directors, had the information of the Individual Defendants' true planned course of conduct been disclosed.

94.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs, as Record Holders, have suffered been denied fair corporate suffrage through the use of a materially deceptive Proxy Statement in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

**COUNT II**

**AGAINST THE INDIVIDUAL DEFENDANTS**

**FOR VIOLATIONS OF SECTION 20(a)**

95.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs, as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

57

positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the misleading financial information filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

96. The Individual Defendants, as members of the Board, are presumed to have had the power to control or influence the filing and dissemination of the Proxy Statement, and exercised the same.

97. As set forth above, the Individual Defendants each violated Section 14(a) by their acts and omissions as alleged in this Complaint.

98. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs, as Record Holders, were denied fair corporate suffrage through the use of a materially deceptive Proxy Statement in violation of Section 14(a) of the Exchange Act.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS

### FOR BREACH OF THE DUTY OF DISCLOSURE/CANDOR

99. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs, as if fully set forth herein.

100. The Individual Defendants owed and owe Plaintiffs and the Record Holders fiduciary obligations. By reason of their fiduciary relationships, Individual Defendants owed and owe Plaintiffs and the Record Holders the highest obligation of loyalty and candor.

101. The Individual Defendants each knowingly and/or recklessly approved the issuance of materially false statements that misrepresented and failed to disclose

1   material information concerning the Company. These actions could not have been a

2   good faith exercise of prudent business judgment to protect and promote the

3   Company's corporate interests.

4       102.  The Individual Defendants have acted disloyally to Plaintiffs and the

5   Record Holders, thereby, violating and breaching their fiduciary duties of oversight,

6   good faith, honesty, and loyalty.  As a direct and proximate result of the Individual

7   Defendants' failure to perform their fiduciary obligations, Plaintiffs and the Record

8   Holders were injured. As a result of the misconduct alleged herein, these Defendants

9   are liable to Plaintiffs as Record Holders.

10      103.  Plaintiffs have no adequate remedy at law.

11                              **COUNT IV**

12                      **AGAINST ALL DEFENDANTS**

13              **FOR AIDING AND ABETTING BREACHES**

14              **OF THE DUTY OF DISCLOSURE/CANDOR**

15      104.  Plaintiffs repeat and reallege each of the allegations set forth in the

16  foregoing paragraphs, as if fully set forth herein.

17      105.  The Individual Defendants owed and owe Plaintiffs and the Record

18  Holders fiduciary obligations.  By reason of their fiduciary relationships, Individual

19  Defendants owed and owe Plaintiffs and the Record Holders the highest obligation

20  of loyalty and candor.

21      106.  Defendants abused the control shareholders entrusted to them by virtue

22  of their high level positions in the Company and were aided and abetted by each

23  other.

24      107.  By reason of the foregoing conduct, the Defendants have injured

25  Plaintiffs and the Record Holders.

26      108.  Plaintiffs have no adequate remedy at law.

27  ///

28  ///

59

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(A)    Invalidating the election at the Annual Meeting resulting from the Proxy Statement;

(B)    Compelling Defendants to correct and redisseminate a true and accurate proxy statement and following the procedures used to disseminate the Proxy Statement;

(C)    Reconducting the election of directors previously held on June 18, 2014, including providing an opportunity for any opposing slates of directors to seek election;

(D)    Removing any and all sitting Individual Defendants from the Board;

(E)    Enjoining the Company's 2015 annual meeting and modifying the Support Agreement until such time as the Record Holders may revote their proxies on an informed basis;

(F)    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(G)    Such other and further relief as this Court may deem just and proper.

Patrice L. Bishop
STULL, STULL & BRODY

April 21, 2015                  s/ Patrice L. Bishop
Patrice L. Bishop
9430 West Olympic Boulevard
Suite 400
Beverly Hills, CA 90212
Tel:    (310) 209-2468
Fax:    (310) 209-2087
service@ssbla.com

Michael J. Klein
Stull, Stull & Brody
6 East 45th Street
New York, NY 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022
mklein@ssbny.com

***Counsel for Plaintiffs***

60